A

# St. Joseph
# Medical Center

September 5, 2001

Ralph J. Monaco, Esquire
Conway & Londregan, P.C.
38 Huntington Street
P.O. Box 1351
New London, Connecticut  06320-1351

RE:    Burton Hutchings

Dear Mr. Monaco:

Mr. Hutchings came under care of the Veterans Administration facilities at the age of 50, in 1998.  In February 1998, he did have a rectal examination that described no masses.  Prostate was within normal limits.  No PSA examination was performed.

Throughout the next several years, the patient was under treatment at the VA facilities. He did not have a subsequent digital rectal examination throughout 1999.  A subsequent digital rectal examination two years later showed an abnormal prostate exam and a high PSA.  When he was ultimately diagnosed, he had a T3B carcinoma of the prostate with a 45% to 50% 8 year survival.  The American Cancer Society Guidelines would call for an annual digital rectal examination, and at that time, the VA Guidelines did call for PSA and sigmoidoscopy as well.  Had an examination been performed a year earlier, I feel that there would most likely have been a T1 to T2 prostate carcinoma with a 75% five year survival after undergoing radiation therapy or surgery.  Failure to perform these interventions resulted in the patient's cancer being far more advanced at the time of his diagnosis with a resultant decrease in the chance for cure and a significant lowering of his survival rate.

I have appended the best reconstruction that I could gather from my files of the testimony that I have given in recent years.  I do not have evidence of giving testimony in a trial or a deposition in the year 1999.

Sincerely,

Arthur A. Serpick, M.D., F.A.C.P.
Vice President, Clinical Affairs/Head, Department of Medicine

attach.
*A spirit of innovation, a legacy of care.*

7601 Osler Drive  Towson, MD 21204-7582  P 410.337.1000  F 410.337.1569
TDD Access 410.337.1671  www.sjmcmd.org

**EXHIBIT A**

B

BYLAWS, RULES, AND REGULATIONS OF THE MEDICAL STAFF
OF VA CONNECTICUT HEALTHCARE SYSTEM

PREAMBLE

The Medical Staff has responsibility for the quality and continuous improvement of care delivered by its members, and is responsible for providing leadership in improving organizational performance, and is accountable to the Governing Body for all aspects of both care and improvement of practitioners and organizational performance. Therefore, the medical staff practicing in the VA Connecticut Healthcare System hereby organize themselves for self governance and to accomplish such by establishing these bylaws, which are intended to be in conformity with the general policies of the Veterans Health Administration (VHA) of the Department of Veterans Affairs (VA) and with other governmental bylaws, rules, and regulations.  The mission assigned to this Healthcare System is to provide, to Connecticut veterans and those referred from elsewhere, high quality health care that meets their needs and legitimate expectations, to promote health through prevention, to encourage research and teaching programs that will further scientific progress and professional competence, and, when needed, to provide support to the Department of Defense.

ARTICLE I  DEFINITIONS

1.  Medical Staff

The Medical Staff is constituted by fully licensed physicians and other licensed individuals permitted by law and given privileges by the VA Connecticut Healthcare System to provide patient care services independently in the West Haven campus, Newington campus, its satellite clinics, and its outreach facilities.

2.  Governing Body

The Governing Body is the Veterans Health Administration (VHA) of the Department of Veterans Affairs.  The Under Secretary for Health of the VA has delegated authority to act on the behalf of the Governing Body for local facility management and planning to the Healthcare System Director.  The Director ("Chief Executive Officer") is appointed by the Governing Body to act as its agent in the overall management of the VA Connecticut Healthcare System.  He/she is assisted by the Chief of Staff (with the Medical Staff Executive Committee and the Clinical Executive Board) and the Associate Directors (with the Administrative Executive Board).

3.  Licensed independent practitioner

All members of the active and affiliate medical staff who are authorized by their privileges to act independently and who are fully licensed or otherwise granted authority to practice in a State, Territory, or Commonwealth of the United States or in the District of Columbia will be referred to as licensed independent practitioners in these Bylaws.

4.  Attending

An attending is a licensed independent practitioner who assumes ultimate responsibility for patient management and supervision of trainees subject only to the administrative control of one or more Service Chief(s).  An attending must be the guarantor of quality of care for the patient and the guarantor that all rules and regulations pertaining to the patient care have been followed.

C

g. Favorable assessment of previous professional competency and conduct and the ability to work with professional colleagues in a manner sufficient to provide assurance that patients for whom they are responsible will receive medical care consistent with professional standards of practice.

h. Competence to provide care to the patient population of the Healthcare System, which consists entirely of adults.

i. Proficiency in speaking and writing the English language.

j. U.S. citizenship.   When it is not possible to recruit qualified citizens, licensed independent practitioners otherwise eligible for medical staff appointment who are not citizens will be eligible for consideration for appointment by providing proof of VISA status, pursuant to qualifications as outlined in VA regulations as provided by 38 U.S.C. 7405.

k. Good physical and mental health consistent with the ability to provide high quality care.  When the Professional Standards Board, Medical Staff Executive Committee, or Governing Body questions the physical and mental health status of the licensed independent practitioner, the licensed independent practitioner shall be required to submit to an evaluation or exam of physical and/or mental health status by a physician or physicians acceptable to the Medical Staff Executive Committee or Governing Body as requisite to further consideration of previously granted privilege or the maintenance of his/her staff appointment.

Section 3.  Basic Responsibilities of Staff Membership

a. All members of the Medical Staff are expected to provide clinical care at or above generally recognized professional standards of practice; provide for continuous care of patients assigned to their care including the ensuring of a smooth transition to a new licensed independent practitioner when going "off service"; abide by the medical staff bylaws and by all other standards, policies, and rules of the Healthcare System and the Department of Veterans Affairs; discharge the staff, clinical service, committee, and healthcare system functions for which they are responsible; prepare and complete (or cause to be prepared and completed) in a timely fashion the medical record and other required records for all patients for whom they provide care or whose care they supervise; participate in continuing education, healthcare system peer review activities, and medical staff monitoring and evaluation; document supervision of residents, fellows, and trainees, where applicable; observe patients' rights in all patient care activities; maintain standards of conduct conducive to effective working relationships with fellow professionals and other members of the healthcare system community; respect patient autonomy by informing them sufficiently to allow their participation in decisions about their care.

b. The members of the medical staff will also abide by federal laws and VA rules and regulations regarding financial and ethical conflicts of interest and regulations regarding outside professional activities.  They will provide care to patients within their scope of privileges and advise the Medical Staff Executive Committee of any change in their ability to meet fully the criteria for Medical Staff membership or to carry out clinical privileges that are held.

c. They will advise the Healthcare System Director, through the Chief of Staff, of any challenges or claims against professional credentials, professional competence, or professional conduct within 30 days of such occurrences, consistent with requirements for appointment under Article V of these Bylaws.

Department of Veterans Affairs
VA Connecticut Healthcare System

Healthcare System Policy No. 11-7                                                September 14, 2000

Patient Progress Notes

**I.  POLICY:**

All patient progress notes must be written at specified frequencies and properly documented in the medial record. Where computer access is available, progress notes will be entered electronically. Electronic signatures are to include the title of the staff member entering the note.

**II.  DEFINITIONS:**

A. Resident refers to an individual who is engaged in a graduate medical education program (which includes all specialties, e.g., internal medicine, surgery, psychiatry, pathology, radiology, or nuclear medicine), or an individual engaged in an approved graduate training program in dentistry, podiatry, or optometry and participates in patient care under the direction of attending physicians (and/or other staff practitioners as appropriate). The term resident also includes individuals in approved subspecialty graduate medical education programs who historically have also been referred to as "fellows."

B. Authentication refers to an appropriate signature and title that enables the identification of the practitioner.

**III.  RESPONSIBILITIES:**

A.  All care line managers and clinical service chiefs are responsible for maintaining adherence to standards for progress notes.

B.  All clinical staff are responsible for selecting electronic notes/templates by correct note title, for completing and signing notes the same day that the patient is seen (an unsigned electronic note is unavailable to other staff for reference), and for including their title/authentication in their electronic signature. Clinical staff are also responsible for updating any note formulated by copying and pasting to describe the patient's current status; for using only approved abbreviations; and for including the rationale for treatments ordered (such as the reason for antibiotic usage).

C.  The Medical Records Committee is responsible for overall evaluation and review of progress note documentation.

**IV.  PROCEDURES:**

A. Each care line or service will enter progress notes in the patient's medical record as indicated in Attachment A and whenever a significant risk event occurs. When a patient is being cared for by a resident or other trainee they must be supervised by an attending physician or licensed independent practitioner, who will meet the documentation requirements outlined in Attachment A. These requirements are consistent with those outlined in HSP11-28 "Resident Supervision."

B.  Clinicians will write a discharge/transfer note for all inpatients being discharged or transferred to another service including between VA NEHS divisions.  The discharge note should include, but is not limited to, the following: diagnoses; surgical procedures; condition upon discharge; follow-up treatment and plans; medications and diet; physical limitations; instructions to patient and family. A discharge note for a death should also include whether or not an autopsy was requested. The transfer note should include, but is not limited to, the following: reason for transfer, diagnoses, condition, treatments given, medications and dosages, results of recent tests, and current diet. The above statement regarding transfer notes does not apply to emergency transfers from Geriatric Evaluation Center, or for transfers to GEC if a discharge summary is available.

C.  An electronic progress note will be written for every outpatient visit except as noted in the attachment for groups and special programs in Psychiatry/Psychology/Social Work/Geriatrics/RCATs. Clinicians will enter electronic progress notes by selecting the appropriate category, e.g. Geriatrics Attending Progress Note. Admitting and emergency visit notes are recorded on VA form 10-10 "Medical Certificate and History."

D. Every progress note will be authenticated with appropriate signature and title. Upon completion of an electronic note, the writer will select "Sign" to authenticate the note with his/her electronic signature and title.

Department of Veterans Affairs
VA Connecticut Healthcare System

Healthcare System Policy No. 11-59                                    October 6, 2000

Assessment of Patients

I. POLICY:
Each patient's need for care or treatment is assessed by physicians, registered nurses, and other qualified health care professionals at the time of initial presentation to the VA Connecticut Healthcare System. A complete history and physical examination is required on all inpatient admissions, and all patients undergoing conscious sedation and general anesthesia. A focused history and physical will be completed for all patients undergoing other invasive procedures not requiring conscious sedation or anesthesia. Information is gathered from the patient, the significant other, when appropriate, and existing medical records. Data are analyzed to determine the kind of care required to meet the patient's initial needs. Identified needs are integrated and prioritized. Reassessment occurs as dictated by individual circumstances but, at a minimum, when there is a significant change in the patient's condition, when the patient undergoes a procedure, when the patient is transferred to another service, and to determine the patient's response to treatment.

II. DEFINITIONS:
A. Complete History and Physical (H&P) Examination: At a minimum, the complete H&P will consist of:
1. Chief complaint
2. History of present illness, pertinent and/or significant past medical history.
3. Review of pertinent systems
4. Physical examination of pertinent anatomical area(s) plus heart and lungs.
5. Current medications
6. Allergies
7. Assessment and plan
B. Focused History and Physical: At a minimum, the focused H&P will consist of:
1. Physical examination of pertinent anatomical area(s).
2. Current medications
3. Allergies

III. RESPONSIBILITY:
A. Each Service Chief/Care Line Manager of settings in which patient assessment occurs is responsible for defining patient assessment activities in writing, specific to the treatment setting.
B. Each Service Chief/Care Line Manager of treatment settings in which patient assessment occurs is responsible for developing criteria required by clinicians to perform patient assessment, specific to the setting. These include, as applicable, 1.) certification, 2.) licensure, 3.) scope of practice and/or clinical privileges.
C. A registered nurse assesses the patient's need for nursing care in all settings where nursing care is' provided.
D. Physicians, nurses, social workers and other qualified health care professionals are responsible for identifying and reporting possible victims of abuse according to criteria described in Healthcare System Policies "11-9 Identification and Reporting of Sexual Abuse," "11-11 Suspected Child Abuse," "11-58 Identification and Reporting of Domestic Abuse," and "122- 7 Protective Services for the Elderly."

IV. PROCEDURE:
A. Assessment of patients will address, as applicable:
1. Biophysical status
2. Psychosocial status
3. Nutritional status

4. Allergy status, including allergy to latex
5. Functional status
6. Existence, nature, and intensity of pain
7. Need for further assessment
8. Need for rehabilitation services
9. Educational needs
10. Cultural influences on patient's beliefs, values, spiritual orientation
11. Discharge Needs
B. Clinician related criteria will address the following, as applicable:
1. The time frames for completion of initial assessment including history and physical, and for completion of the assessment
2. Conditions, criteria, and time frames for reassessment of patients.
C. If a history and physical examination has been performed within 30 days before admission, a durable, legible copy of this report may be used in the patient's medical record provided any changes that may have occurred are recorded in the medical record at the time of admission.
D. Substance abuse patients will be assessed for any history of abuse.
E. Assessment findings will be documented and maintained in the medical record.
F. Patient care will be planned by an interdisciplinary team based on analysis of assessment data.

V. REFERENCE:
JCAHO Comprehensive Accreditation Manual for Hospitals, current edition

VI. RESCISSION:
Healthcare System Policy No.11-59 dated June I, 2000

VII. REVIEW SERVICE AND DATE:
Office of the Physician Executive          October 6, 2002



PAUL J. McCOOL
Executive Director, VA Connecticut Healthcare System


DISTRIBUTION: All Service Chiefs/Care Line Managers/Program Managers (A)
                        All Supervisors (B)
                        All Physicians, Dentists, Nurses (D)

**D**

MEDICAL RECORD                                                     Progress Note:

NOTE DATED: 02/09/1998 10:18   PHYSICAL EXAMINATION
VISIT: 02/09/1998 10:18 PSYCHIATRY-ER AM (WHAV)
Vital Signs: Pulse 92/min   Temp 98F   Respirations 16    BP 250/132
General:
HEENT: Normocephalic, atraumatic. Pupils equal, round and reactive to
       light reflex. Mouth without lesions, throat without erythema or
       exudate.
Neck:  Supple, without thyromegaly or masses.
Back:  No CVA tenderness
Chest: Clear to auscultation and percussion
Cardiac:Pulses symmetrical. Regular rate and rhythm. No murmurs, rubs or
       gallops. No bruits
Abdomen: Soft and nontender without orgamomegaly or masses. Bowel sounds
       normal.
Genitalia:no masses. no penile discharge
Rectal: no masses; prostate wnl; heme (-)
Extremities: No cyanosis or clubbing.
Skin:  intact
Neuro:
       Cranial Nerves:
              I: Not tested
              II-XII: intact
       Cerebellar:
              Gait wnl
       Peripheral NS:
              Sensory deferred
              Motor  5/5 all groups
       Deep Tendon Reflexes:
              Biceps  2+
              Triceps 2+
              Patellar 2+
              Ankle    2+
       Babinsky   negative
       Rhomberg   negative

Review of Systems:no chest pain; no dyspnea, no orthopnea; no cough or
hemoptysis; no N/V/D; No hematemesis or melena.
Blood pr (fresh red blood in toliet); no dysuria or hematuria; no
headaches; daily pain in back radiating to the front

MSE: Well groomed, dressed appropriately, speech is coherent. Mood is
dysphoric with reactive affect. Thought process is goal directed and
thought content is wtihout delusions or hallucinations; no suicidal or
homicidal thoughts or plans. Cognitively intact.

Impressions:
ETOH withdrawal
fresh red blood per rectum; presently heme (-). Patient has a hx of
hemorrhoids with operation in the past.
High BP, probably a combination of HTN history and ETOH withdrawal; d/w
                    ** THIS NOTE CONTINUED ON NEXT PAGE **

HUTCHINGS,BURTON M            VACT HEALTHCARE SYSTEM     Printed:09/12/2000 08:
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 DOB:04/25/1948      Pt Loc: OUTPATIENT                  Vice SF 5

50

MEDICAL RECORD                                                    Progress Notes

02/09/1998 10:18        ** CONTINUED FROM PREVIOUS PAGE **

Dr. Zayliss, MD who recommended re-starting Lopressor which patient has
not taken for 6-years. One should start at 50mg bid and titrate to 100mg
bid.

Labs: CBC, chem 19, PT/PTT, Calcium profile, Mg, TSH, TFT, Utox and UA and
ECG are pending.

Plan:
Will hold in Psych Er and observe for withdrawal. Will medicate
accordingly with oxazepam 30mg q3hr prn for withdrawal. Will supplement
with vitamins
Will re-start metoprolol at 50mg bid
Will put in for a primary care clinic appointment

                    Signed by: /es/ JOSEPH R CASSAR
                               MD 02/09/1998 10:30
                  Cosigned by: /es/ Oscar F. Hills, M.D.
                               Chief, Psychiatric Emergency Room 02/10/1998 (
8:27

---

HUTCHINGS,BURTON M              VACT HEALTHCARE SYSTEM      Printed:09/12/2000 08:4
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 DOB:04/25/1948        Pt Loc: OUTPATIENT              _   Vice SF 50

49

E

MEDICAL RECORD
Progress Notes

NOTE DATED: 02/23/1998 16:14    MEDICINE OUTPATIENT PROGRESS NOTE
VISIT: 02/23/1998 16:14 ZZZGIMC (WHAV)
Burton Hutchings is a 49 year old man with history of hypertension and
alchoholism who came to the clinic complaining that his blood pressure
medication was excessive.

HPI: The patient  was in good health until 3 days prior to his clinic
visit when he noticed while shopping that he felt light headed and that he
might pass out.  When he sat down the light-headedness passed.  2 days
prior to admission the patient was standing at rest and developed a
sensation that the building was moving.  Also during the past week the
patient has been unable to have an erection; a problem that he experienced
several years ago when he was on a beta-blocker.  These symptoms of
light-headedness and erectile dysfunction have developed since beginning
antihypertensive medication (metoprolol and lisinopril) 2 weeks ago and he
attributes these symptoms to the medication.  The medication was started
when his systolic blood pressure was measured to be over 200 during
hospitalization for alchohol detoxification.  Since starting the
medication, he has been taking his own blood pressure daily and it has
been much lower.  Yesterday he measured a BP of 105/70.

PMH: gout
alchoholism - The patient came to the hospital for detoxification 18 days
ago.  Since then he has been followed by an outpatient detox program and
has remained alchohol-free.

Meds:
metoprolol 100 mg BID
lisinopril 5 mg qd
indomethacin 50 mg TID

Allergies: NKA

SH:
EtOH - 25 yrs.  Most recently as much as 1 quart of vodka per day
beginning at 9:30 am.
Cigarettes - 3/2 ppd for 25 yrs
Patient is not working now.

FH: Brother died of diabetes, mother has pacemaker, father died of heart
attack.

PE: VS: T 97.2  BP 136/74  P 71
HEENT: white sclera
Lungs: clear
Heart: RRR, normal S1 and S2, no murmers, rubs, or gallops
ABD: non-distended, non-tender, no ascites, liver and spleen not palpable
Extrem: no edema, no tender or inflammed joints, hands did not tremble

A/P: In summary, Hutch is a 49 year old man with history of hypertension
** THIS NOTE CONTINUED ON NEXT PAGE **

HUTCHINGS,BURTON M              VACT HEALTHCARE SYSTEM       Printed:09/12/2000 08:40
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 DOB:04/25/1948      Pt Loc: OUTPATIENT                      Vice SF 509



02/23/1998 16:14        ** CONTINUED FROM PREVIOUS PAGE **

and alchohol abuse who comes to the clinic complaining of lightheadedness
and erectile dysfunction that he attributes to excessive hypertension
medication.

1) hypertension: Today the patient's BP is well-controlled.  We will
discontinue the metoprolol as the patient requested but will increase the
lisinopril to 10 mg qd.  The patient agrees to follow his BP every day
with his personal BP monitor and will call us if it changes dramatically.
He is scheduled to come back to the clinic in 1 month (3/23) for review.

2) EtOH abuse: Patient continues to be alchohol-free and followed by an
outpatient detox program.  The patient was on oxazepam but finished his
course and no longer feels he needs it.

3) Gout: continue indomethacin

4) health maintainance: to be adressed at his next visit.

                        Signed by: /es/ GAIL VITAGLIANO
                               02/23/1998 16:48

81

F

| MEDICAL RECORD | PROGRESS NOTES |
|---|---|

DATE
12·1·98

**CLINIC:**

**PROVIDER:**

**ATTENDING:**

Patient is binge drinker. last binge was 1week ago.

Also c/o no nocturnal erection. still smoking;

started after get 1st Labetolol IV

VITALS BP: 160/80.

Chest. clear to A/P

HT: S1S2 ⊕ murmur

**MEDS**

9907  48      CHO  366.

SGPT 54.    133 | 22    BUN 19/1.3

5.0 | 101    gu 1/7

NCU 97.9.

Impression

① HTN - B.P excellent diastolic, still ↑ systolic

② DC ALL ETOH

③ Impotence: ? 2° Felodipine, smoking, ETOH

DC ETOH

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle grade; rank; rate; hospital or medical facility)

Hutchings  Borton

229 - 62 - 6927

| REGISTER NO | WARD NO |
|---|---|

PROGRESS NOTES
STANDARD FORM 509 (Rev. ...)
Prescribed by GSA/ICMR
FIRMR (41 CFR) 201-45.505
509 · ·

117

## PROGRESS NOTES

CLINIC:

PROVIDER: ③ √ PSA

ATTENDING: ④ ↑ CHO 399 — √ Lipid profile

⑤ meld able LFT — ? 2° large chunky

— repeat aft. DIC

Cancer

RTC 6 weeks.

S———

MEDS:

STANDARD FORM 509 BACK (Rev 11-77)

116

**G**

MEDICAL RECORD

NOTE DATED: 01/03/2000 17:32   PHYSICAL EXAMINATION
VISIT: 01/03/2000 13:00 PSYCHIATRY-ER AM (WHAV)
Temp. 98.0   P86,   B/P 179/106,   R 18,   Breathlyzer 0.000

1) General Appearance: well-proportioned adult male in NAD

2) Head & Neck: head old scar left forehead, neck supple with full ROM

3) Eyes: EOMI, PERRL, fundoscopic exam normal

4) Ears: auricle and pinnae intact, TM's invisible, impack cerumen both ears

5) Nose: good air flow bilaterally, mucosae non-inflamed bilaterlly

6) Mouth/Throat: tongue, and posterior pharynx intact without
inflammation, good dentition

7) Chest: symmetrical expansion with respiration

8) Lungs: clear to auscultation bilaterally

9) Cardiovascular: regular rhythm, no murmurs

10) Abdomen: non-distended, non-tender, normal active bowel sounds, no
masses or hepatosplenomegaly

11) Genitalia/Rectal: not tested

12) Back: symmetric, no kyphosis or scoliosis, no CVA tenderness

13) Extremities: no cyanosis or edema, warm and dry, mutlple small scars
in nuckle area both hands.

14) Skin: mutiple round/oval patches covered with grey scales in back and
extremeties.

15) Lymphatic: no lymphadenopathy

16) Neurologic: oriented x3, speech of normal rate, tone and volume.
    Sensation intact to touch, pain.
    Motor strength 5/5 throughout, muscle tone normal, no fibrillations or
        fasciculations, no atrophy or involuntary movements.
    Cerebellar: no ataxia, incoordination, or gait abnormality.
    CN I not tested, II-XII grossly intact.
    DTR's 2+ throughout, plantar's downgoing bilaterally.

A/P: 1) HTN, 2) r/o psoriasis.  Pt to be referred to primary care clinic
for f/u treatment of his medical problems.

** THIS NOTE CONTINUED ON NEXT PAGE **

HUTCHINGS,BURTON M            VACT HEALTHCARE SYSTEM       Printed:04/04/2000 10:52
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 DOB:04/25/1948      Pt Loc: OUTPATIENT                    Vice SF 509

MEDICAL RECORD                                                    Progress Notes

01/03/2000 17:32        ** CONTINUED FROM PREVIOUS PAGE **

                   Signed by: /es/ VITHARON BOON-YASIDHI, MD
                                   PAOD 01/03/2000 17:39
                 Cosigned by: /es/ OSCAR F HILLS
                                   Chief, Psychiatric Emergency Room 01/04/2000 0
8:13

**H**

**CONNECTICUT SURGICAL GROUP, P.C.**
**Division of Urology**
85 SEYMOUR STREET  SUITE 416
HARTFORD, CT  06106-5501

March 17, 2000      Burton Hutchings            #143162

**Office visit:** Rocky Hill Veterans patient with hard, irregular prostate and
elevated PSA. Ultrasound performed which did demonstrate what appeared to be
a mass at the base of the prostate. Sextant biopsies were taken. The
patient tolerated the procedure well.        (V)

May 16, 2000    Burton Hutchings                  #143162

**Office Visit:** Patient of Dr. Viets from the Rocky Hill Veterans Home and
Hospital. A 51 year old gentleman who is now five months into alcohol
rehabilitation at that facility. He has been dry throughout that time. He
was found to have an elevated PSA of 20, Gleason grade 7 adenocarcinoma on
ultrasound involving the right apex, middle base and left base region. The
right lobe is clinically abnormal, stage T2B. He is scheduled for radical
prostatectomy. We went over the details of this procedure along with the
possibility of positive lymph nodes. We will probably not do nerve sparing
although consider it on the left side. He is currently divorced but has a
full time partner. He does not, however, have normal erectile function. For
these reasons, the extent of nerve sparing with be limited. He understands
and agrees with this approach.        (L)


May 22, 2000    Burton Hutchings                   #143162

**Surgery:** Radical retropubic prostatectomy. Bilateral pelvic lymph node
dissection performed. There was some stickiness around the bladder neck but
the lymph nodes were negative and no gross disease.        (L)

May 30, 2000        Burton Hutchings              #143162

**Office Visit:** One week status post radical prostatectomy. Staples were
removed today. Plans call for catheter to be removed next week. I reviewed
with him his final pathology which showed extensive disease, 20-25 cubic cm
with periprostatic and seminal vesicle involvement. Given that, I
recommended adjuvant therapy to begin in 2-3 months.        (L)

**3**



# STATE OF CONNECTICUT

## DEPARTMENT OF VETERANS' AFFAIRS

287 West Street
Rocky Hill, Connecticut 06067

March 27, 2000

To Whom It May Concern:

Mr Burton Hutchings is currently under my care. When I performed an admission physical on him on 1/21/2000 I noticed that his prostate exam (performed by digital rectal examination) was slightly irregular. I drew a PSA (prostate specific antigen) that was reported back at 20.07. I referred him to Dr. Viets (a GU surgeon) and a subsequent biopsy showed prostate CA with a Gleason score of 7 out of 10. Due to the late finding of his disease his treatment is considerably more complicated than if his diagnosis had been made earlier.

Sincerely,

Carol A. Whelan, APRN, MS, CS, ANP

J



# STATE OF CONNECTICUT

## DEPARTMENT OF VETERANS' AFFAIRS
### 287 West Street
### Rocky Hill, Connecticut 06067

April 5, 2000

To Whom It May Concern:

Mr. Burton Hutchings was seen by me for an admission physical on 1/21/2000. At that time he gave a history of recent onset impotence and was found to have an abnormal prostate exam (by digital rectal exam) and (following current guidelines), a PSA was sent that returned at 20.07. A subsequent TRUS exam and biopsy revealed advanced adenocarcinoma with a Gleason score of 7 (out of 10). He is currently undergoing staging to determine the proper course of treatment.

I have had the chance to review Mr. Hutchings care while he was a patient at WHVA. He had a physical done in 1999 when he presented for treatment for alcoholism and was referred to primary care. Under rectal exam it was written "not done." This is clearly not the standard of care for a 51 year old male. He should have had at least a digital rectal exam, and I believe current VA guidelines call for a PSA and sigmoidoscopy. The failure to diagnose his cancer in a timely fashion may have resulted in his cancer being far more advanced at time of diagnosis, with a resultant decrease in the chance for a complete cure, and at the very least a far more difficult course of treatment. I believe that he may be eligible for compensation under VA section 1151.

Sincerely,

*Carol A. Whelan*

Carol A. Whelan, APRN,CS,MS,ANP

Reviewed by Dr. Evans Daniels, MD

*EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER*

**K**

# DISCHARGE SUMMARY

**HARTFORD HOSPITAL**

NAME: HUTCHINGS, BURTON          MR #: 304-9247     ACCOUNT #: 57768434

**DICTATOR:** Vincent P. Laudone, M.D.

**ADMITTED:** 05/22/2000          **DISCHARGED:** 05/26/2000

**PRIMARY DISCHARGE DIAGNOSIS:**   Adenocarcinoma of the prostate, stage T3B, N0, M0, Gleason grade VII (3+4).

**ADDITIONAL DISCHARGE DIAGNOSES:**   Hypertension. History of alcohol abuse.

**HISTORY:**  The patient is a 52-year-old gentleman was has been followed through the VA system.  He was found to have an elevated PSA of 20.  Urologic work-up by Dr. Douglas Viets revealed a normal size prostate with Gleason grade VII adenocarcinoma in four out of six biopsies.  Metastatic work-up negative.  He is now admitted to the hospital for a radical prostatectomy.  Thorough preoperative evaluation revealed him to be a generally healthy-appearing 52-year-old gentleman in no acute distress.  Lungs are clear. Heart without rubs, murmurs, or gallops.  Abdomen benign. Extremities without edema.  Neuro exam intact.

**HOSPITAL COURSE:**  On day of admission, he was taken to the operating room where he underwent a radical retropubic prostatectomy with bilateral pelvic lymph node dissection. Surgery without difficulty or complication.  Postoperatively, his epidural catheter did not function properly and he was switched to patient-controlled analgesic pump.  This was much more satisfactory for pain control.  It did delay his progress, however.  Eventually, his diet was advanced, Jackson-Pratt drain removed and he was discharged home in good condition on 5/26/00.

Final pathology showed extensive prostate cancer, Gleason grade VII with 20-25 cubic centimeter estimated tumor volume.  There was extension to both seminal vesicles and into the periprostatic tissues on the left side.  Plans will be made for adjuvant radiation therapy once he has fully recovered from his surgical intervention.

cc:  Douglas H. Viets, M.D.
     Rocky Hill Veterens Home & Hospital

REVIEWED AND APPROVED BY                                     Page 1 of 1

JOB: VPL/TL768/48872     DATE DICTATED: 06/08/2000   08:45   DATE TYPED: 06/08/2000

L

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

BURTON HUTCHINGS,                          :

             Plaintiff,                 :        Civil No. 3:01CV540 (CFD)

                                    :

                                    :

UNITED STATES OF AMERICA,                  :

             Defendant.                :        November 21, 2002

### DEFENDANT'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and based on discussion between counsel of record, the Defendant, United States of America, hereby makes supplemental objections and responses to Plaintiff's December 13, 2001 Interrogatories and Request for Production of Documents as follows:[1]

A.     OBJECTIONS TO INTERROGATORIES

1 (a) -(c).    **OBJECTION.**  Defendant objects to Interrogatory Number 1 on the grounds that it is vague and overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  The defendant is the United States of America.  This question seeks information concerning an unspecified "you".  Defendant cannot respond to these vague allegations.  Defendant also objects to Interrogatory Number 1(a) through (c) as the questions regarding former names, date of birth and residence address ask for personal information, the disclosure of which would be an unwarranted

---

[1]For the sake of clarity, defendant has included its original objections but has made supplemental responses as appropriate, subject to those objections.

**SUPPLEMENTAL RESPONSE.**  Subject to and without waiving this objection, defendant avers as follows.   To the extent that counsel has clarified that this interrogatory asks for information whether Drs. Cassar and Hills performed a prostate examination on February 9, 1998, defendant has no information beyond what is reflected in the medical records concerning these treatment dates.  Information beyond the medical record is appropriately obtained through deposition testimony.

26.    **OBJECTION.**  The information concerning this visit can be derived by Plaintiff from the Plaintiff's VA medical records, a second copy of which is produced herewith. Reference is made to those records pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

**SUPPLEMENTAL RESPONSE.**  Subject to and without waiving this objection, defendant avers as follows.   Defendant has no information beyond what is reflected in the medical records concerning these treatment dates.  Information beyond the medical record is appropriately obtained through deposition testimony.

27.    **OBJECTION.**  The information concerning this visit can be derived by Plaintiff from the Plaintiff's VA medical records, a second copy of which is produced herewith. Reference is made to those records pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.  The issue of why a prostate examination was not performed at that particular visit is one more appropriately addressed through fact and expert testimony.

- 9 -

**SUPPLEMENTAL RESPONSE.**   Subject to and without waiving this objection, defendant avers as follows.   Defendant has no information beyond what is reflected in the medical records concerning these treatment dates.  Information beyond the medical record is appropriately obtained through deposition testimony.

28.    **SUPPLEMENTAL RESPONSE.**   The VA does not have a policy specific to prostate abnormalities and prostate cancer.

29.    **SUPPLEMENTAL RESPONSE.**   <u>See</u> Healthcare System Policies, 11-7 and 11-59, previously provided.

30.    **OBJECTION.**   Defendant objects to Interrogatory Number 30 on the grounds that it is vague and overbroad and not reasonably calculated to lead to the discovery of admissible evidence.

**SUPPLEMENTAL RESPONSE.**    Subject to and without waiving this objection, defendant avers as follows. <u>See</u> Medical Staff by Laws 1997-2000, previously produced.