UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIELLE NORDSTROM, Administratrix of the Estate of Burton Hutchings, <br> Plaintiff, | : <br> : <br> : <br> : | |
| v. | : | 3:01-cv-540 (CFD) |
| UNITED STATES OF AMERICA, <br> Defendant. | : <br> : <br> : | |

**MEMORANDUM OF DECISION**

**I.    Introduction**

Plaintiff Danielle Nordstrom brought this suit in her capacity as administratrix of the estate of Burton Hutchings ("Hutchings") against the United States of America alleging medical malpractice pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1).[1] The plaintiff claims that, on at least two separate occasions, medical professionals at Veterans Affairs facilities acted in contravention of the requisite standard of care by failing to test Hutchings's Prostate Specific Antigen ("PSA"). Hutchings contends that had this test been performed, the test results would have been elevated, indicating the presence of prostate carcinoma, and his tumor could have been discovered and removed. Hutchings further asserts that because the test was not performed, the cancerous tumor grew outside his prostate before ultimately being detected in 2000, making his eventual prostate surgery and post-surgical course of treatment more difficult, painful, and less effective.

---

[1] Mr. Hutchings himself initiated this suit; however, due to his death on October 22, 2006, Ms. Nordstrom, in her capacity as administratrix of Hutchings's estate, was substituted as the proper party plaintiff on April 12, 2007.

The following are the Court's findings of fact and conclusions of law following a bench trial.

## II.     Findings of Fact

The Court finds the following facts:

A.     February 1998 Hospital Visit

Hutchings first arrived at the Psychiatric Emergency Room ("Psych ER") at the Veterans Affairs ("VA") Hospital in West Haven, Connecticut on February 9, 1998, seeking treatment for alcohol dependence.[2]  At that time, Hutchings was 49 years, 10 months old.[3]  Hutchings reported drinking approximately one quart to one-half gallon of vodka per day for the past 9 months.  He had a 25 year history of alcohol dependence.  He also had a history of smoking cigarettes. During the intake process, the emergency room nurse took Hutchings's blood pressure and found it to be 250/134.  Hutchings admitted that he had not taken his anti-hypertensive medication (Lopressor) for six years.  Hutchings was held in the Psych ER for two days for the management of his extremely high blood pressure.

As part of Hutchings's admission to the VA Hospital, on February 9th, Dr. Joseph Cassar (a fourth-year psychiatry resident) performed a physical examination on Hutchings, the report of which was co-signed by Dr. Oscar Hills, the Chief of the Psych ER.[4]  During this examination,

---

[2] The Psych ER is a separate emergency room that treats patients who present with potentially life threatening conditions related to psychiatric disorders, including substance abuse. Withdrawal syndromes are, at least initially, treated in the Psych ER.

[3] Hutchings was born on April 25, 1948.  He was a U.S. Navy Veteran who had served in the Vietnam conflict.

[4] Dr. Hills co-signed the report to acknowledge that he had reviewed the records and that the treatment was appropriate.

Dr. Cassar performed a digital prostate and rectal exam on Hutchings. Cassar noted in his report that Hutchings had no rectal masses, that his prostate was within normal limits, and "heme (-)," meaning no rectal bleeding. On February 11, 1998, Hutchings was transferred from the Psych ER to a psychiatric inpatient unit (G8West) due to potential complications during alcohol withdrawal. Hutchings had a second physical on February 12, 1998 while an inpatient. No PSA test was performed on Hutchings as part of either physical or at any time during his February 1998 hospital stay.

On February 13th, Hutchings was transferred to outpatient detox at the so-called "Q-House" at the West Haven VA hospital.[5] On February 17, 1998, after successfully completing the alcohol detoxification program, Hutchings was transferred to a substance abuse day treatment program (SADP) at VA West Haven on February 23, 1998. The plan was for Hutchings to participate daily in the substance abuse treatment program "for a minimum of three weeks." His treatment was to be provided by Dr. Michael Gill as his primary clinician and Dr. Christopher Gottschalk as the attending psychiatrist. Also on February 23, 1998, Hutchings was evaluated by Dr. Gail Vitagliano in the Outpatient Medicine Clinic. Dr. Vitagliano noted that Hutchings complained of erectile difficulties during the past week, which Hutchings attributed to excessive hypertension medication. Dr. Vitagliano adjusted the anti-hypertensive medication and instructed him to return to the clinic in one month. She also noted that Hutchings's health maintenance was to be addressed at his next visit. Hutchings participated in the substance abuse program until March 17, 1998. Hutchings failed to keep subsequent scheduled visits and was

---

[5] "Q-House" is a "quarterway," or halfway, house where people who are discharged from the psychiatric hospital can go while participating in the detox program.

discharged from the program. His next contact with the VA healthcare system was in October 1998.

B.      October and December 1998 Visits

On October 26, 1998, Hutchings returned to the West Haven VA Hospital; his blood pressure was initially 238/136 and he had resumed his heavy drinking.[6] He was sent to the emergency room to reduce his blood pressure. Upon discharge on October 26, Hutchings was instructed to return to the VA clinic in two days to see his primary care physician, Dr. Haskell, to address his blood pressure and "health maintenance." On October 29, 1998, Hutchings was seen by Dr. Sujata Prasad at the VA New London Clinic as a "walk-in" patient. Although Dr. Prasad gave Hutchings a flu shot during this visit, Hutchings's October 29, 1998 visit was otherwise a focused visit for the purpose of checking Hutchings's high blood pressure and his medication for it. During this visit, Dr. Prasad was not Hutchings's established primary care physician. On October 30, 1998, Hutchings's ex-wife cancelled Hutchings's follow-up appointment with his primary care physician, Dr. Haskell in West Haven, due to "transportation difficulties." She also asked that Hutchings receive primary care services at the New London clinic because he lived in that area. As a result, Hutchings was next seen at the New London VA facility.

On December 1, 1998, Hutchings arrived at the New London VA facility complaining, inter alia, of "impotence." Hutchings was again seen by Dr. Prasad. In addition to addressing Hutchings's complaint of impotence, Dr. Prasad also discussed with Hutchings his continuing issues with hypertension and binge drinking. She advised Hutchings to discontinue all alcohol

---

[6] Although the stipulation notes that Hutchings returned to the Emergency Room on October 29, 1998, the evidence shows that Hutchings actually returned to the West Haven VA hospital on Monday, October 26, 1998.

use because of its possible contribution to both the hypertension and the impotence.

During this visit, Dr. Prasad also wrote "✓PSA" in her progress notes. It was Dr. Prasad's custom and practice to write "✓PSA," whenever she ordered a PSA blood test.[7] She would then hand the patient a blood slip with the PSA test noted and tell the patient she was ordering a PSA test to check for cancer of the prostate. Dr. Prasad also would not normally accompany patients to get their blood drawn at the laboratory, which was located across the hall from the examining room in New London. Although Dr. Prasad testified that she did not remember the particulars of this visit with Hutchings, she did recall that she ordered the PSA test, in part, because Hutchings was then over the age of 50 and, in part, because she wanted to establish Hutchings as her patient and felt it necessary to "know everything about his history and physical." Therefore, Dr. Prasad followed her custom and practice and gave Hutchings a blood slip ordering the PSA test; she also told Hutchings the purpose of the blood test, that is, checking for prostate cancer.

Finally, Dr. Prasad advised Hutchings to make an appointment to return to the clinic in six weeks and noted "RTC [Return to Clinic] 6 weeks" in her progress notes. Hutchings did not return to the VA in New London or West Haven in 1999, and there is no medical record evidence of Hutchings having received any treatment at the VA in 1999. Hutchings did not go to the laboratory for his blood test (including the PSA test) after Dr. Prasad gave him the blood slip on December 1, 1998.

C.   January 2000 and Beyond

Thirteen months later, on January 3, 2000, Hutchings again appeared at the VA West

---

[7] "PSA" is the Prostate Specific Antigen, a reliable test for prostate cancer.

Haven Campus Emergency Room requesting alcohol rehabilitation. At the time of his January 3, 2000 admission, Hutchings underwent an examination, the note for which indicates "Genitalia/rectal: not tested."[8] The note also states that he was "to be referred to primary care clinic for f/u treatment of his medical problems." On January 4, 2000, Hutchings was again admitted to the VA Connecticut Day Hospital Substance Abuse Treatment Program. According to the medical records, Hutchings expressed an interest in admission to the Rocky Hill Veterans Home & Hospital. His primary clinician requested an extension in the VA Connecticut Quarterway House on Medical Center grounds so Hutchings could continue to reside there until completing the SADP.

On January 27, 2000, Hutchings was discharged from the substance abuse program after having been "clean and sober" since January 5, 2000. The discharge plan was as follows: "The pt. has an appt. with his PCP, Dr. Prasad in New London, on 2/9/00 at 3:30. He is scheduled for admittance to the VRC at Rocky Hill V.H. & H on 1/28/00." In January 2000, Hutchings was admitted to the Rocky Hill Veterans Home and Hospital. Shortly thereafter, he was diagnosed with adenocarcinoma of the prostate. He subsequently underwent a serious of treatments and surgery related to prostate cancer. Hutchings died on October 22, 2006 from complications resulting from the prostate cancer.

### III. Conclusions of Law

A. Federal Tort Claims Act and Medical Malpractice

The Federal Tort Claims Act waives the federal government's sovereign immunity with

---

[8] Hutchings's estate is not stating a claim based on any acts, events or omissions that may have occurred in January 2000 or thereafter.

respect to certain tort claims arising out of the conduct of Government employees. 28 U.S.C. § 1346(b)(1); see also Devlin v. United States, 352 F.3d 525, 530 (2d Cir. 2003). Specifically, § 1346(b)(1) provides that

> the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Here, both parties agree that the claimed acts and omissions all occurred in Connecticut; thus, the substantive tort law of Connecticut applies. Id.; see also Zuchowicz v. United States, 870 F. Supp. 15, 21 (D.Conn. 1994).

Connecticut law requires a plaintiff alleging medical malpractice to prove "(1) the requisite standard of care for treatment, (2) a deviation from the standard of care, and (3) a causal connection between the deviation and the claimed injury." Zuchowicz, 870 F. Supp. at 21 (citing Hammer v. Mount Sinai Hosp., 596 A.2d 1318, 1327 (Conn. App. Ct. 1991)). "The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Conn. Gen. Stat. § 52-184c(a).[9] The plaintiff essentially maintains that the VA hospital system committed malpractice

---

[9] If the health care provider is certified as a specialist, or holds him or herself out as a specialist, a "similar health care provider" is one who: "(1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'." Conn. Gen. Stat. § 52-184c(c).

beginning in 1998 for failure to diagnose Hutchings's prostate cancer.

B.  February 1998 Treatment at the West Haven VA Hospital

The plaintiff argues that the guidelines of the American Medical Association and the American Cancer Society, as well as the VA's own bylaws and guidelines, demonstrate that the requisite standard of care for a 49-year-10-month-old male with Hutchings's history required a PSA test. However, neither the American Cancer Society Guidelines nor the American Medical Association Guidelines required a PSA test for a 49-year-old male in February 1998. Rather, in the absence of a prior familial history of prostate cancer, both guidelines called for PSA tests on non-African American males to begin at age 50. The plaintiff, though, contends that Hutchings's proximity to age 50, as well as his "risk factors" and the VA's own policies, establish that the standard of care required a PSA test in February 1998 when he arrived at the West Haven Psych ER.

Although failure to follow hospital rules or policies may be evidence of negligence, hospital regulations, rules and policies "do not themselves establish the standard of care." Law v. Camp, 116 F. Supp. 2d 295, 310 (D.Conn. 2000) (citing Van Steensburg v. Lawrence & Mem'l Hosps., 481 A.2d 750, 753 (Conn. 1984)). "Thus, merely because there is a hospital policy, the hospital is not legally obligated to guarantee that the policy is followed." Id. at 310–11. Moreover, after examining the VA bylaws and regulations in conjunction with the testimony of "similar health care providers," the Court finds that those bylaws and regulations, as well as the standard of care, did not require a PSA test for an individual presenting with Hutchings's history and characteristics in February 1998.

The plaintiff stresses that the VA Bylaws require a "complete history and physical"

within 24 hours of a patient's admission. Plaintiff notes a distinction between the "complete" physical required for inpatients and the "sufficient . . . physical examination" for outpatients or the "pertinent . . . physical" for patients receiving operations. However, under VA Policy 11-59, a "complete history and physical" includes a "review of *pertinent* systems,"[10] not a review of every possible system. The prostate was not a "pertinent" system or part of one for a 49-year-10-month old male presenting for alcohol detox and hypertension in February 1998.

Even absent this definition, a "complete history and physical" does not include conducting a PSA test in this circumstance. Dr. Cassar performed a digital rectal and prostate examination on Hutchings and found his prostate to be within normal limits and that no rectal masses existed. As asserted by Dr. Frances in his testimony, particularly in the setting of a psychiatric emergency room, a more detailed examination of Hutchings was not then required. This testimony was bolstered by that of Dr. Bayer, a physician with thirty years of experience in emergency medicine, who asserted that a PSA screening test is primarily evaluated by a primary care physician, not a doctor in an emergency situation.

Moreover, even when Hutchings was admitted to the inpatient psychiatric unit and the outpatient detox program, the standard of care did not require a PSA test. Hutchings presented with and was admitted for symptoms unrelated to prostate carcinoma—particularly alcohol detox and, subsequently, high blood pressure. Although Hutchings had been exposed to Agent Orange and was a smoker of cigarettes, particularly in light of the negative rectal and prostate exam, the

---

[10] Although the Court recognizes that this definition is derived from the October 6, 2000 policy, the plaintiff's own witness, Dr. Serpick, testified that there was no "material difference in the VA policy during . . .1996 to 2000, with respect to doing a history and physical." Additionally, because none of the earlier policies contained definitions, the 2000 policy is still useful for consideration.

presence of these possible risk factors does not sufficiently establish that the standard of care required a PSA test for a 49-year-10-month-old male in February 1998.

Therefore, because the plaintiff has not established that the standard of care required a PSA test for Hutchings under these factual circumstances in February 1998, the Court finds for the defendant on plaintiff's claim for medical malpractice arising out of alleged acts or omissions by the VA Hospital and its doctors in February 1998.[11]

C.    October and December 1998 Visits to the West Haven and New London VA Facilities

The plaintiff argues that because Hutchings was 50 years old in both October and December 1998, Dr. Prasad clearly deviated from the standard of care by not ordering a PSA test in October, never advising Hutchings of his need to obtain a PSA test or his potential risk of prostate cancer, and not ordering the PSA test or following through in making sure Hutchings obtained the PSA test in December.

The Court finds that the standard of care did not require Dr. Prasad to order a PSA test on Hutchings in October of 1998. Although Hutchings was over 50 years of age at that time, Dr. Prasad did not see Hutchings in the capacity of a primary care physician at that time. Hutchings's October 1998 visit was a targeted, "walk-in" clinic visit to follow-up on his hypertension which was treated in the VA Emergency Room days earlier. At the time of Hutchings's October 1998 visit, Hutchings had a separate appointment scheduled with his primary care physician, which his ex-wife subsequently cancelled on his behalf. Thus, because Dr. Prasad was only briefly seeing Hutchings for a targeted reason and was not acting as his

---

[11] Because the Court finds that the standard of care did not require a PSA test, the Court declines to address whether the requisite standard of care was met and the issue of causation.

primary care physician, the standard of care did not require Dr. Prasad to test Hutchings's PSA at that time.

The Court agrees with the plaintiff that the standard of care required Dr. Prasad to order a PSA test on Hutchings during his December 1998 visit. However, because Dr. Prasad did order the PSA test on Hutchings, she did not breach or deviate from the standard of care. The standard of care did not require Dr. Prasad to follow Hutchings to the laboratory to ensure that he had the blood test performed or to follow-up with Hutchings if he did not return for a scheduled appointment. Rather, Hutchings had the affirmative duty to obtain the blood test ordered as well as to schedule and return for follow-up appointments.

Therefore, because the plaintiff has not established that Dr. Prasad or the VA system deviated from the standard of care required in October and December of 1998, the Court finds for the defendant on plaintiff's claim for medical malpractice arising out of the alleged acts or omissions by the VA system in October and December of 1998.

## IV.    Conclusion

Accordingly, JUDGMENT SHALL ENTER FOR THE DEFENDANT and the clerk is directed to close this case.

The defendant's oral motion for judgment as a matter of law [Dkt # 114] is DENIED as moot in light of this opinion.

SO ORDERED this   23rd   day of August 2010, at Hartford, Connecticut.


                                        /s/Christopher F. Droney
                                        **CHRISTOPHER F. DRONEY**
                                        **UNITED STATES DISTRICT JUDGE**